IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

DERRICK BUNKLEY                    )
                                   )
        Plaintiff,                 )
                                   )   Case No.
v.                                 )
                                   )
CITY OF DETROIT, SERGEANT          )
MARCELLUS, LATONYA MOSES,          )
GLENDA FISHER, CHRISTOPHER         )
MOREAU, TROY WESLEY, JAY           )
TANGWAY, AND UNKNOWN EMPLOYEES     )   JURY TRIAL DEMANDED
OF THE CITY OF DETROIT,            )
                                   )
        Defendants.                )


**COMPLAINT**

NOW COMES Plaintiff, DERRICK BUNKLEY, by and through his

attorneys, LOEVY & LOEVY, and complaining of SERGEANT MARCELLUS,

CHRISTOPHER MOREAU, TROY WESLEY, LATONYA MOSES, GLENDA FISHCER,

JAY TANGWAY AND UNKNOWN EMPLOYEES OF THE CITY OF DETROIT

(collectively "Defendant Officers") and THE CITY OF DETROIT

(hereinafter "City"), and alleges as follows:

**Introduction**

1.   Plaintiff Derrick Bunkley was convicted of an assault

with intent to murder of which he was totally innocent.

Defendant Officers framed Plaintiff by procuring a false

identification from the victim of the crime even though

Plaintiff did not match the victim's description of her

assailants. The only reason Plaintiff even became a person of

interest to the Defendants was due to sheer happenstance:
Plaintiff went to the same hospital as the victim because his
father was also the victim of a gun crime that night and
receiving emergency treatment there.

2.   As a result of Defendants' misconduct, Plaintiff spent
nearly two years wrongly imprisoned from age twenty-two to
twenty-four until a court reversed his conviction and the State
dropped all the charges against him.  He now brings this lawsuit
seeking redress for the violations of his constitutional rights.

## Jurisdiction

3.   This action is brought pursuant to 42 U.S.C. § 1983 to
redress violations of Plaintiff's constitutional rights.

4.   This Court has jurisdiction for Plaintiff's
constitutional claims pursuant to 28 U.S.C. § 1331 and
supplemental jurisdiction for his state law claims pursuant to
28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391(v). The
events giving rise to this complaint occurred in this judicial
district.

## The Parties

5.   Derrick Bunkley is a twenty-four-year-old native of
Detroit, Michigan, where he has resided his whole life.
Plaintiff is employed at a local car wash and is studying to
attain his GED.

6.    At all times relevant hereto, Defendants Sergeant Marcellus, Christopher Moreau, Troy Wesley, Latonya Moses, Glenda Fisher, Jay Tangway and other unidentified employees of the Detroit Police Department ("Defendant Officers") were police officers or otherwise employed by the Detroit Police Department. All are sued in their individual capacities, and acted under color of law and within the scope of their employment during the investigation and prosecution of the crime at issue.

7.    The City of Detroit is a Michigan municipal corporation. The City of Detroit is or was the employer of each of the Defendant Officers.

## The Paris Ainsworth Shooting

8.    Just before midnight on May 3, 2014, Paris Ainsworth returned home from work and parked her car on the street in front of her home near the intersection of Beaverland and Keeler Streets.

9.    As she exited her vehicle, two men dressed in dark clothing approached her and pointed guns at her.

10.   One of the men ordered Ms. Ainsworth "not to pull it," or words to that effect, as he approached her. He then fired a shot, hitting her in her side.

11.   Ms. Ainsworth returned fire with a .45 caliber gun she had on her person.

12.  Ms. Ainsworth did not know if she hit either of her assailants.

13.  The two men fled on foot down the street.

14.  Ms. Ainsworth went across the street to her neighbor's home for assistance.  The neighbor had already called 911 to alert the police of the shooting.

15.  Within minutes of the shooting, Officers Moreau and Wesley from the Eighth Precinct arrived on the scene.  They briefly spoke to Ms. Ainsworth, during which time she described her assailants as two black males wearing all black.  She purportedly provided no further descriptions of their height, weight or other identifying features.

16.  Shortly after the arrival of Officers Moreau and Wesley on the scene, an ambulance arrived and transported Ms. Ainsworth to Grace Sinai Hospital for emergency care.

### The Charles Knox Shooting

17.  The Paris Ainsworth shooting was not the only violent crime to occur in Detroit that night.  In fact, there were more than 1,000 shootings in Detroit in 2014, an average of nearly three shootings every day of the year.

18.  About an hour after the Ainsworth shooting, and more than seven miles away, on Sorrento Avenue near Chicago W, Plaintiff's father, Mr. Charles Knox, was shot twice, once in

4

each thigh by individuals who were attempting to rob him as part of a drug-related robbery.

19.   Although he had been shot, Mr. Knox was able to run a few blocks to 9501 Iris Street, where his brother and sister were residing.

20.   Mr. Knox's sister or brother called 911 to report he had been shot.

21.   Police officers from the Twelfth Precinct responded to the scene and Mr. Knox explained that he had been robbed by three black males just around the block.

22.   At approximately 1:12 a.m., an ambulance was dispatched to 9501 Iris Street and transported Mr. Knox to Grace Sinai Hospital.

23.   At approximately 1:24 a.m., Plaintiff's uncle called him to inform him that his father had been shot and was being transported to Grace Sinai Hospital for emergency care.

24.   Plaintiff, who was at his mother's home, alerted his mother to the distressing news, quickly dressed and ran to the hospital, which was not far from his mother's home.

25.   Plaintiff waited with his family in the waiting room while his father was provided emergency care.

**Plaintiff's Unlawful Arrest**

26.  At approximately 1:45 a.m., Officer Tangway interviewed Paris Ainsworth at the hospital during which she provided two brief descriptions of her assailants. She described the first assailant as a black male in his 20s, with a height around 5'7", weighing 200 pounds, with a dark complexion and wearing dark clothing.  Ms. Ainsworth described her second assailant as another black male in his 20s, with a height around 5'3"-5'4", with a medium build, caramel complexion and a small afro.

27.  Plaintiff's physical characteristics do not match the description of the assailants save being a black male in his 20s, which is also true of a significant portion of the population of Detroit.

28.  Plaintiff is 5'11". At that time, he was very skinny, and he is not dark-skinned.  Plaintiff's father, Charles Knox, also bore no resemblance whatsoever to Ms. Ainsworth's description of her assailants.  Most obviously, Mr. Knox was forty-seven years old, at least twenty years older than Ms. Ainsworth's descriptions of her assailants. Mr. Knox is not dark-skinned either.

29.  Based on the victim's own description of her assailants, Defendant Officers lacked a reasonable basis to support their belief that Plaintiff and his father were possible

6

suspects.  Aside from being African American males, neither
resembled Ms. Ainsworth's description of the men who attacked
her.

30.  Nevertheless, when Defendant Officers arrived at the
hospital, they approached Plaintiff while he was in the waiting
room and asked his to identify himself.  Plaintiff fully
cooperated with the police.

31.  Defendant Officers walked away, and after a brief
period of time, they returned back to where Plaintiff and his
family had been sitting in the waiting room.

32.  Defendant Officers proceeded to arrest Plaintiff
explaining that Plaintiff had an outstanding warrant.  However,
no valid outstanding warrants existed for Plaintiff at that
time, which Plaintiff made clear to the Defendant Officers who
arrested him.

33.  Officers Moreau and Wesley transported Plaintiff to
the Detroit Detention Center.

34.  When Plaintiff was arrested at the hospital, Defendant
Officers lacked any reasonable basis to support a probable cause
finding that he had committed any crime related to Ms.
Ainsworth, or any other crime.

35.  The next morning, Defendant Officers placed Mr. Knox
under arrest while he was hospitalized as well, even though they

lacked reasonable basis to believe that Mr. Knox had assaulted Ms. Ainsworth.

### The Photo Arrays

36. The following day, Defendant Moses and Fisher showed Ms. Ainsworth photo arrays of Plaintiff and his father.

37. At that point in the investigation, Defendant Officers lacked any reasonable basis to place Plaintiff or his father in photographic array because there was no reasonable basis to assume that he had anything to do with any crime.

38. Defendants Moses and Fisher showed Ms. Ainsworth a photo array of Mr. Knox, but Ms. Ainsworth did not identify him as one of the shooters.

39. Defendant Officers never disclosed to Plaintiff the photo array report that Ms. Ainsworth was shown with the photograph of Mr. Knox and failed to make a positive identification even though it was evidence that Plaintiff could have used at his trial to impeach Ms. Ainsworth.

40. Despite the fact that Plaintiff had nothing to do with the crime, Ms. Ainsworth purportedly identified Plaintiff as one of the shooters.  Defendants employed unduly suggestive techniques to manipulate Ms. Ainsworth into selecting Plaintiff as her assailant so that the Defendant Officers could initiate criminal proceeding against him.

8

41.   Defendant Officers never disclosed to Plaintiff or the prosecutor the manner in which they manipulated Ms. Ainsworth to falsely identify Plaintiff.

42.   Without her identification of Plaintiff's photograph in the array, Defendants lacked any basis to charge Plaintiff with the crime.   In this way, the Defendants Officers manufactured the sole basis of probable cause through their misconduct.

### Plaintiff Provides A Valid Alibi

43.   A few hours later, when Defendant Moses interviewed Plaintiff, he explained that he had nothing to do with the crime, and that he had gone to the hospital to see his father, who had been the victim of a crime.

44.   Plaintiff told Defendant Moses he had been at his mother's home that evening with his mother and younger brothers taking photographs with his brothers on his cell phone and posting them on Facebook.

45.   Plaintiff provided Defendant Moses his Facebook login and password information as well as his email address so that she could check and verify what he said was true.

46.   Had Defendant Officers conducted even the most basic investigation of the facts and information provided to them, they would have been able to verify that Plaintiff was nowhere near Beaverland Street at 11:55 p.m. on May 3, 201, because the

9

photographs taken on his phone were taken between 11:40 and
11:44 p.m. and contemporaneously posted to Facebook.  In
addition, the cell towers that Plaintiff's phone was
transmitting signals to corroborated that Plaintiff was at his
mother's home located at 16260 Hartwell Street.

### Plaintiff's Over-Detention

47.   The Defendants improperly detained Plaintiff for more
than 48 hours before taking him to court to arraign him.  The
manner in which Plaintiff was detained unlawfully in excess of
48 hours is consistent with the policy and practice of the
Detroit Police Department.

### Plaintiff's Wrongful Conviction

48.   On September 15, 2014, a three-day jury trial
commenced against Plaintiff.

49.   The State's theory of the case was that Plaintiff had
committed the assault on Ms. Ainsworth with his father, Charles
Knox, who was shot allegedly by Ms. Ainsworth as she tried to
defend herself.

50.   Based on the Defendants' misconduct, the only evidence
the State had at trial to link Plaintiff to the crime was Ms.
Ainsworth's false identification of Plaintiff in the photo array
that she was shown while hospitalized.

51.   There was absolutely no physical evidence or any other
evidence linking Plaintiff to the crime.

10

52.   At the trial, Defendant Moses lied and testified falsely that Plaintiff's father had bullets in his leg but that he would not allow the police to have them.

53.   This was not true.   The bullets passed through Mr. Knox's legs and only tiny fragments were depicted on the scans at the hospital.

54.   Plaintiff was not allowed to impeach Ms. Ainsworth regarding her failure to make a positive identification of his father, Charles Knox, because Plaintiff did not have a copy of the photo array report documenting that she could not identify Plaintiff's alleged co-assailant.

55.   On September 17, 2014, the jury found Plaintiff guilty of assault with attempt to murder, possession of a firearm by felon, carrying a concealed weapon, and felony-firearm.

56.   On October 2, 2014, the court sentenced him to serve fifteen-to-thirty years on the assault with attempt to murder, concurrent with two one-to-five years on the possession of firearm and a two-year consecutive term for the felony-firearm charge.

57.   The State never charged Mr. Knox with assaulting Ms. Ainsworth.

**Plaintiff's Exoneration**

58.   Always maintaining his innocence, Plaintiff filed an appeal challenging his conviction, providing evidence from Plaintiff's Facebook page and a map depicting the cell phone towers his cell phone and his father's cell phone were hitting when the crimes occurred.  This evidence corroborated the locations the two men claimed to have been at the time of the shooting, and neither location was near the scene of the Ainsworth shooting.  On February 19, 2016, the appellate court reversed Plaintiff's wrongful conviction, and remanded the case. The State subsequently dropped all charges against Plaintiff and he was released.

**Plaintiff's Damages**

59.   Plaintiff spent almost two years from age twenty-two to twenty-five incarcerated for a crime he did not commit. During his wrongful imprisonment, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  He missed out on the ability to share holidays, births, funerals and other life events with loved ones and the fundamental freedom to live one's life as an autonomous human being.

60.   Plaintiff suffered substantial emotional and physical damages, all proximately caused by the Defendants' misconduct.

**Legal Claims**

61.   In the manner described above and more fully below,
the Defendant Officers violated Plaintiff's constitutional
rights.   The Defendant Officers violated, among others,
Plaintiff's rights under the Fourth and Fourteenth Amendments.
The Defendant Officers' conduct, described herein, also
constitutes violations of Michigan law.   The Defendant Officers'
conduct, described herein, was objectively unreasonable and was
undertaken intentionally with malice, willfulness, wantonness,
and reckless indifference to the rights of others.

62.   The Defendant Officers unreasonably seized and
detained Plaintiff without lawful justification, in violation of
the United States Constitution and Michigan law.

63.   The Defendant Officers fabricated evidence and
withheld exculpatory and/or impeachment evidence from Plaintiff
that he could have used at his criminal trial in violation of
the United States Constitution.

64.   The Defendant Officers caused the unlawful seizure of
the Plaintiff pursuant to legal process that was unsupported by
probable cause and caused Plaintiff to be maliciously
prosecuted, without probable cause, for a crime he did not
commit.   The criminal proceedings have ultimately resolved in a
manner indicative of Plaintiff's innocence in violation of the
United States Constitution and Michigan law.

13

65.  All of the misconduct described in this complaint was undertaken pursuant to the policy and practice of the Detroit Police Department in that the City directly encourages, and is thereby the moving force behind the very misconduct at issue.

66.  The City has fails to adequately to train its officers on the duties its officers must perform, and fails also to supervise and control them such that its officers conduct arrests without probable cause, detain individuals in excess of 48 hours without a probable cause determination by a court, falsify probable cause to initiate criminal proceedings, and withhold exculpatory/impeachment evidence from criminal defendants.  The inadequacy of the City's training is the result of its policy makers' deliberate indifference to remedy its known inadequacy to train its officers which has resulted in violations of its citizens' rights.  The City's failure to train and supervise its officers proximately caused Plaintiff's injuries here.

67.  In addition, the City fails to adequately punish or discipline prior instances of when officers, such that Detroit police officers believe that their misconduct will never be scrutinized or punished.  Specifically, officers who conduct arrests without probable cause, detain individuals in excess of 48 hours without a probable cause determination by a neutral magistrate, falsify probable cause to initiate criminal

14

proceedings, and withhold exculpatory/impeachment evidence from criminal defendants believe they can act with impunity.

68.   The City and the relevant policy makers have actual knowledge of these persistent and widespread practices resulting in constitutional violations of its citizens, and yet they have failed to act to remedy the patterns of abuse described above, thereby causing the injuries alleged here.

69.   One or more of the Defendant Officers failed to intervene to prevent harm to Plaintiff from the numerous unconstitutional acts committed by their fellow Police Officer Defendants, in violation of the United States Constitution. Specifically, one or more of the Defendant Officers had a reasonable opportunity to prevent another Officer from arresting someone without probable cause, detain and individual in excess of 48 hours without probable cause determination by a court, initiating a criminal proceeding against Plaintiff without probable cause and hiding exculpatory/impeachment information from Plaintiff before his criminal trial.

70.   The Defendant Officers' actions also constituted intentional infliction of emotional distress because their actions were extreme and outrageous, undertaken with the intent to inflict severe emotional distress or with knowledge that there was a high probability that their conduct would inflict

15

such distress, and Plaintiff suffered severe emotional distress
as a result of Defendant Officers' misconduct.

71.   The Defendant Officers entered into an agreement
amongst themselves to deprive Plaintiff of his constitutional
rights and to participate in an unlawful act or act in an
unlawful manner toward Plaintiff, including by conspiring to
unlawfully seize Plaintiff, initiate a criminal proceeding
against him that lacked a legal basis, and withheld exculpatory
and/or impeachment evidence from him prior to his criminal
trial.  One or more of the Defendant Officers took an overt act
in furtherance of this conspiracy, all in violation of both
state and federal law.

72.   All of the Defendant Officers' actions were undertaken
under color of law and within the scope of their employment such
that their employer, Defendant City of Detroit, is liable for
their actions.

73.   Michigan law provides that Defendant City of Detroit
must indemnify the Defendant Officers for any liability arising
out of the scope of their employment activities.  Accordingly,
the City of Detroit must pay any tort judgment awarded to
Plaintiff for compensatory damages resulting from the Defendant
Officers' actions.

74.   Additionally, in committing the acts alleged in the
preceding paragraphs, the Defendant Officers were members and

16

agents of the Detroit Police Department acting at all relevant times within the scope of their employment.  Defendant City is liable as principal for all torts committed by its agents.

WHEREFORE Plaintiff DERRICK BUNKLEY respectfully requests that this Court enter judgment in his favor against SERGEANT MARCELLUS, CHRISTOPHER MOREAU, TROY WESLEY, LATONYA MOSES, GLENDA FISHCER, JAY TANGWAY and THE CITY OF DETROIT awarding compensatory damages, costs, and attorneys' fees, along with punitive damages against each of the individual Defendants in their individual capacities, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

/s/ Jon Loevy
Attorney for Plaintiff

Arthur Loevy
Jon Loevy
Russell Ainsworth
Heather Lewis Donnell
Julie Goodwin
LOEVY & LOEVY
311 North Aberdeen Street, 3d Floor
Chicago, IL 60607
(312) 243-590