UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DERRICK BUNKLEY,

    Plaintiff,                                             Civil Action No. 16-CV-11593

vs.                                                        HON. BERNARD A. FRIEDMAN

CITY OF DETROIT, et al.,

    Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on defendants' motion for summary judgment [docket entry 70]. Plaintiff has responded and defendants have replied. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion without a hearing.

## FACTS

On May 3, 2014, at approximately 11:30 p.m., two men accosted and shot Paris Ainsworth as she exited her vehicle outside her Detroit home. Pulling her own gun, she returned fire. Her attackers fled. Unsure if she had hit them, she ran across the street to her neighbor's house, where she called 911. An ambulance arrived shortly thereafter and transported her to Sinai Grace Hospital.

That same night at approximately 11:15 p.m., plaintiff arrived at his mother's house, 4.5 miles away from Ainsworth's house. For the next few hours, he ate, chatted on his phone, played video games, and dressed for bed. He also took pictures with his phone and posted them on Facebook. At 1:30 a.m. on May 4, plaintiff received a call that his father, Charles Knox, had been shot by three armed men near Knox's apartment, which is seven miles away from

Ainsworth's house. Plaintiff immediately went to Sinai Grace Hospital, where Knox was taken. He saw Knox around 2:00 a.m.

The Detroit Police Department's (DPD's) response team for both crimes consisited of detectives Calvin Washington, Jade Tanguay, and Marshall Dennis. They inspected the scenes immediately after dispatch received the 911 calls, and by 1:45 a.m. they were at the hospital to talk to Ainsworth and Knox. Ainsworth described her attackers as two black males in their twenties wearing dark clothing. She described one as dark-skinned, 5'7", and 200 lbs.; the other was light-skinned, 5'4", and had a medium build. Ainsworth told the officers she may have shot one of them.

The officers then visited Knox. Knox, who was forty-seven years old at the time, told them where he was when he was shot, but the officers thought he was lying. In fact, they began to suspect that Knox and plaintiff were actually Ainsworth's assailants and that Knox had been shot while he and plaintiff—two black men in dark clothes—were holding her up.

Consequently, shortly after 2:00 a.m., the detectives trooped into the waiting room and began to question plaintiff. They left, but returned a few minutes later and—with the permission of their supervisor, Sergeant Lucas, whom they called in the interim—arrested plaintiff, citing a fictional[1] probation violation as the reason for the arrest. By 3:00 a.m., they had arrested plaintiff, and Officers Wesley and Moreau took him to the Detroit Detention Center ("DDC").

Later that morning, around 11:00 a.m., Investigator Latonya Moses was assigned plaintiff's case. This was Moses's first investigation as lead investigator. At 2:30 p.m., she and Investigator Glenda Fisher conducted with Ainsworth a photo lineup of both plaintiff and Knox. A show-up attorney attended the photo lineup and found nothing suggestive. Ainsworth chose

---

[1] During the initial conversation, plaintiff told the arresting officers that he had resolved the referenced probation issues. He later testified that a DDC guard told him he was arrested for felonious assault, not on a warrant. In their interrogatory answers, defendants concede that they arrested plaintiff for felonious assault.

plaintiff in thirty seconds, confidently exclaiming, "That's him, that's him. Yes, I'll never forget." Pl.'s Br. p. 7. But when Moses showed her Knox's lineup, she said, "[N]o, he was younger."[2] *Id.* at 12.

Around 5:00 p.m., Moses went to the DDC and took plaintiff's statement. Plaintiff told Moses that he was at his mom's house during the shooting. His alibi was proved, he told her, by his posted Facebook pictures. He gave Moses his login information so she could corroborate his story.

The following day, Moses presented a warrant packet to assistant prosecutor Matthew Penney. The packet wrongly stated that (1) plaintiff and Knox came into the hospital together; (2) Knox had refused to turn over the bullets that injured him; and (3) hospital security detained plaintiff.[3] Moses failed to mention plaintiff's exculpatory Facebook posts or that Knox was picked up by the ambulance seven miles from Ainsworth's house.

During trial, Moses sat at counsel table and assisted Penney. The jury found plaintiff guilty of assault with intent to commit murder, and he was sentenced to fifteen to thirty years imprisonment. Plaintiff filed a petition for post-conviction relief. Forensic testing of his phone in October 2015 verified his alibi: an investigator found that the Facebook photos were "taken between 11:40 and 11:44 p.m. on May 3, 2014." *Id.* at Ex. 36.

In February 2016, the prosecutor dismissed all charges. Three months later, plaintiff filed the instant case. Now, defendants have filed a motion for summary judgment.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) states that any party moving for summary judgment must identify "each claim or defense . . . on which summary judgment is sought. The

---

[2] Notably, this photo lineup cannot be found.
[3] All parties agree that these facts are objectively false.

3

court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). If the moving party satisfies this burden, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## DISCUSSION

### I. Plaintiff's Voluntary Dismissals

Plaintiff has agreed to voluntarily dismiss "Defendants Wesley and Moreau from all claims. Plaintiff also voluntarily dismisses his Fourteenth Amendment *Brady* violation and suggestive identification claims and his state law claim for intentional infliction of emotional distress." Pl.'s Resp. p. 50 n.16. Investigator Fisher's only connection with this case was her work on the photo lineup—i.e., plaintiff's suggestive identification claim. Accordingly, the Court

4

dismisses the *Brady*, suggestive identification, and IIED claims, as well as all claims against defendants Wesley, Moreau, and Fisher.

## II. Moses's Misrepresentations at Trial

Defendants correctly note that plaintiff cannot use Moses's witness testimony to establish the existence of a tort or constitutional violation, as witnesses are absolutely immune from suit. *Briscoe v. LaHue*, 460 U.S. 325, 335–36, 342 (1983). Consequently, the Court will disregard Moses's testimony in making its findings.[4]

## III. Federal Law Claims

### A. False Arrest

Plaintiff asserts a false arrest claim against defendants Washington, Tanguay, and Dennis under 42 U.S.C. § 1983. Defendants argue that there was probable cause for the arrest.

"[T]he existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Wilson v. Morgan*, 477 F.3d 326, 334 (6th Cir. 2007) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000)). "[P]robable cause exists only when the police officer discovers reasonably reliable information that the suspect has committed a crime." *Courtright v. City of Battle Creek*, 839 F.3d 513, 521 (6th Cir. 2016) (quotation marks omitted). The facts and circumstances must "warrant a prudent man in believing that" plaintiff committed a crime. *Id.* The Court considers the totality of the circumstances and both inculpatory and exculpatory facts known to the arresting officer. *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015). "Thus, if the officer discovers information or evidence favorable

---

[4] The Court notes that plaintiff supports his claims against Moses with far more than merely her trial testimony. For example, in support of his claims against Moses, plaintiff cites her deposition, Ainsworth's deposition, Penney's deposition, plaintiff's deposition, and plaintiff's statement given to Moses. The Court may use these in its analysis.

to the accused in the course of an investigation, the officer cannot simply turn a blind eye." *Courtright*, 839 F.3d at 521 (quotation marks omitted).

Here, the Court, viewing the facts in the light most favorable to plaintiff, finds that there is a genuine issue of material fact as to probable cause. A reasonable jury could find that the arresting officers lacked probable cause to arrest plaintiff. The Court considers the facts known to the arresting officers at the moment of arrest. *See Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003). Notably, plaintiff was arrested between 2:00 a.m. and 3:00 a.m.—i.e., before Moses conducted the photo lineup and learned of plaintiff's Facebook alibi.

What facts did the officers know at the moment of arrest? On the one hand, Ainsworth told the officers that she may have shot one of her assailants, and Knox had been shot. Also, both Knox and plaintiff were black males wearing dark clothing. On the other hand, Knox was much older and had a lighter complexion than Ainsworth's second assailant. Knox was shot several miles away from Ainsworth's house. Plaintiff and Knox did not enter the hospital together. And the description "black males in twenties in dark clothing" is vague. How many thousands of black men in their twenties live in and around Detroit? And how many of those wear dark clothes? Too many for summary judgment. There is a genuine issue of material fact as to probable cause.

B. Malicious Prosecution[5]

Malicious prosecution includes "wrongful investigation, prosecution, conviction, and incarceration." *Barnes v. Wright*, 449 F.3d 709, 725-16 (6th Cir. 2006). To state a claim for

---

[5] The Court notes that the only defendant defendants' request for summary judgment as to this count names is Moses. In plaintiff's response, however, he states, "[S]ufficient evidence exists for the jury to find that not only Defendant Moses, but also Defendants Tanguay, Washington and Dennis all participated and influenced the criminal prosecution of Plaintiff to support a claim for malicious prosecution." This confusion about who the claim is against arises because of the complaint's format. Rather than specifying the individual officers against whom the malicious prosecution claim is asserted, the complaint simply states that "Defendant Officers . . . caused Plaintiff to be maliciously prosecuted." Compl. ¶ 64. This problem of ambiguity recurs throughout the complaint. The Court will grant summary judgment as to any malicious prosecution claim against Sergeant Lucas and the arresting officers because plaintiff fails to allege evidence sufficient for a reasonable jury to find that they initiated a criminal prosecution against plaintiff.

6

malicious prosecution, plaintiff must show that: (1) defendant "made, influenced, or participated in the decision to prosecute" the criminal action initiated against plaintiff; (2) the criminal prosecution lacked probable cause; (3) because of the prosecution, plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in plaintiff's favor. *Trakhtenberg v. Cty. of Oakland*, 661 F. App'x 413, 420–21 (6th Cir. 2016) (quoting *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010)). That an officer "did not make the decision to prosecute does not absolve [her] of liability." *Sykes*, 625 F.3d at 311.

Only elements (1) and (2) are at issue. Defendants argue that probable cause existed to arrest plaintiff and that Moses did not participate in or influence the decision to prosecute.

A reasonable jury could find that Moses participated in or influenced the decision to prosecute. Moses was the lead investigator. She sent a warrant packet to the prosecutor. She took the stand. She personally assisted the prosecutor during trial. Perhaps Moses did not make the ultimate decision to prosecute, but a reasonable jury could find that she influenced it.

Conversely, no reasonable jury could find that Sergeant Lucas or the arresting officers influenced or participated in the decision to prosecute. Plaintiff fails to allege facts showing that any of them were involved in the case beyond the initial arrest. Consequently, the malicious prosecution complaint against every defendant but Moses is dismissed.

Further, there is a genuine dispute as to whether probable cause existed sufficient to prosecute plaintiff. As outlined above, there is a genuine issue of material fact as to probable cause sufficient to *arrest* plaintiff. Whether there existed probable cause sufficient to *prosecute* plaintiff is a different question. By its very nature, probable cause to prosecute may wax and wane during the course of an investigation as law enforcement discovers new information.

7

There were several conflicting pieces of information Moses discovered post-arrest. For example, the morning after the shooting Ainsworth gave a strong, positive identification of plaintiff. But she also concurrently gave a strong, negative identification of Knox—the arresting officers' only link from Ainsworth to plaintiff. Moses also discovered the exculpatory Facebook evidence. Viewing this evidence in a light most favorable to plaintiff, a reasonable jury could find that the prosecution lacked probable cause. Consequently, this claim survives summary judgment.

C. Failure to Intervene

To survive summary judgment on this claim, plaintiff must sufficiently allege "that the officers '(1) observed or had reason to know that [the constitutional harm was occurring], and (2) had both the opportunity and the means to prevent the harm from occurring.'" *Holloran v. Duncan*, 92 F. Supp. 3d 774, 793 (W.D. Tenn. 2015) (quoting *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014)). In *Jacobs v. Village of Ottawa Hills*, 5 Fed. App'x 390, 395 (6th Cir. 2001), the Sixth Circuit held that "officers must affirmatively intervene to prevent other officers from violating an individual's constitutional rights." These constitutional rights include the right to be free from unlawful arrest. *Holloran*, 92 F. Supp. 3d at 795 (holding that in the Sixth Circuit, failure-to-intervene claims can lie for failure to prevent an unlawful arrest).

Here, all four of the allegedly offending officers were present for or explicitly assented to plaintiff's arrest. If the arrest was unlawful, they observed it and/or had an opportunity to prevent it. Further, the constitutional harm element—i.e., false arrest—is already going to the jury. Therefore, this claim survives summary judgment

D. Conspiracy

Plaintiff does not allege one fact—even circumstantial—showing a conspiratorial agreement. Therefore, summary judgment is granted as to this claim.

E. *Monell* Claim

To succeed on a *Monell* claim, a "plaintiff must prove that a policy or custom of the governmental entity was the 'moving force' behind the alleged constitutional violation." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The policy or custom may consist of "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The Supreme Court in *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985), and *City of Canton v. Harris*, 489 U.S. 378 (1989), held that the Court cannot reasonably infer a failure to train or supervise based on allegations of a single incident, even if the offending officer was unsatisfactorily trained or supervised.

Only element (3), inadequate supervision, is at issue here. The Court must consider whether a reasonable jury could find that the specific policy or custom of inadequate supervision plaintiff alleges was the moving force behind plaintiff's four surviving federal claims: unlawful detention, false arrest, malicious prosecution, and failure to intervene.

Plaintiff fails to allege facts sufficient to show that a policy or custom of inadequate supervision was the driving force behind the alleged constitutional violation. To successfully prosecute a *Monell* claim for inadequate supervision, plaintiff must allege more than one instance of wrongdoing. Here, however, plaintiff alleges only one incident, focusing almost solely on the facts of his case.[6] A custom or practice is a widely accepted way of conducting police business, not a once-off mistake. Without more, this claim cannot survive summary judgment.

---

[6] For example, plaintiff says, "A jury could reasonably conclude that the *inadequate review of the Ainsworth Investigation* by both precinct-level supervisors and, more fundamentally, the policymakers, was the moving force behind Plaintiff's wrongful conviction." Pl.'s Br. p. 45 (emphasis added).

Plaintiff's only other proof of a broader policy or custom is the Department of Justice's Quarterly report, but that does not help him either. The report lists several DPD policies and analyzes a sampling of random cases to determine whether DPD complies with its own policies. The report includes percentages of compliance for most policies.

Included in the report's Arrest Policies section was DPD Policy U43, which states:

> The DPD shall review all arrests for probable cause at the time the arrestee is presented at the precinct or specialized unit. This review shall be memorialized in writing within 12 hours of the arrest. For any arrest unsupported by probable cause or in which an arraignment warrant was not sought, the DPD shall document the circumstances of the arrest and/or the reasons the arraignment warrant was not sought on an auditable form within 12 hours of the event.

Pl.'s Br. Ex. 41, p. 55. In other words, the DPD requires supervisors to complete a post-arrest probable cause assessment. Out of the 101 random cases sampled, only one arrest lacked probable cause, and in *every case* a supervisor examined a case file within 12 hours of the arrest. DPD is 97% compliant with this policy, and in all previous reports its status was "In Compliance." *Id.*

Even so, plaintiff believes the report contains a smoking gun. He argues that it shows that DPD's "ability to document and timely prepare warrant submittals to the prosecutor has been problematic, and that the failure to do so causes other violations of the policy. (See U50, U51, and U53.)'"[7] *Id.* at 54. The cryptic "other violations of the policy" sounds ominous, and potentially relevant, but none of the named policies—U50, U51, and U53—are relevant to plaintiff's claims. All three policies are located in the Prompt Judicial Review section, which lists DPD policies requiring warrant requests for arraignments to be made no more than forty-eight hours after an arrest. Additionally, DPD is, respectively, 99%, 95%, and 97% compliant with these three policies. *See id.* at 61–65.

---

[7] Each policy is given its own "U number"—e.g., U43, U50, etc.

In sum, as to the issue of supervisors screening arrests for a lack of probable cause, the DOJ report gives DPD a solid A+, 100%. No reasonable jury could use this report as evidence of inadequate screening. In fact, the report shows exactly the opposite. Even the "Other violations" plaintiff cites are exceedingly rare.

Finally, the Court notes that here, when the arresting officers called their supervisor, Sergeant Lucas, he immediately responded to their question—i.e., he supervised them.

Plaintiff fails to show that an unconstitutional departmental policy or custom exists that was a moving force behind the alleged violation. Therefore, summary judgment is granted for defendants as to his *Monell* claim.

F. Qualified Immunity

Defendants assert a qualified immunity defense to all of plaintiff's federal claims. The Sixth Circuit recently articulated the applicable,

> well-established two-prong test: (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such "that a reasonable official would understand that what he is doing violates that right." *See Saucier v. Katz*, 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citation omitted).

*Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015). If the "legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *McKenna v. Edgell*, 617 F.3d 432, 437 (6th Cir. 2010). For example, in *Green v. Throckmorton*, an officer arrested a woman after she failed a sobriety test, but her failure was not clear—the court called the results "ambiguous." 681 F.3d 853, 865 (6th Cir. 2012). The court held that the officer was not entitled to qualified immunity because a reasonable jury could have found that he acted

reasonably or unreasonably. *Id.* at 864. It reasoned that the issue of probable cause was unclear, so determining qualified immunity was inappropriate. *Id.* at 866.

1. *Unlawful Detention, False Arrest, and Malicious Prosecution*

As defendants admit, an individual's right to be arrested only when probable cause exists is clearly established. Thus, the question is whether, viewing the facts in the light most favorable to plaintiff, the arresting officers and Sergeant Lucas violated plaintiff's clearly-constitutional rights.

Here, as in *Green*, the question of qualified immunity "turns upon which version of the facts one accepts." *Id.* at 864. As noted above, there are disputed issues of material fact, specifically whether there was probable cause to arrest and prosecute plaintiff. Arguments can be made on both sides. For example, the jury could find that the officers were justified in their arrest of plaintiff because he and Knox matched Ainsworth's description. Or, it could find that the description was too general and insufficient to support probable cause. Because the reasonableness of the officers' conduct is going to the jury, granting defendants' motion for qualified immunity is not appropriate. *See Kennedy v. City of Cincinnati*, 595 F.3d 327, 336–38, n.7 (6th Cir. 2010).

2. *Failure to Intervene*

Plaintiff asserts a failure to intervene claim against the officers, alleging that they could have stopped his wrongful arrest but chose not to do so.[8] Defendants' strongest response is that the duty to intervene in false arrest/unlawful detention cases is not clearly established. The court in *Braswell v. McCamman*, No. 1:15-CV-1336, 2017 WL 2666449, at *6–7 (W.D. Mich. June 21, 2017), detailed the standard the Court uses to determine whether a constitutional right is clearly established:

---

[8] To the extent plaintiff states a claim against Moses for failure to intervene, it is dismissed. Moses was not present when plaintiff was arrested and detained. Therefore, she could not have intervened.

In determining whether a law is clearly established, ordinarily this Court looks to decisions of the Supreme Court and the Sixth Circuit. *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007); *see Andrews v. Hickman Cty., Tenn.*, 700 F.3d 845, 853 (6th Cir. 2012) ("When determining whether a constitutional right is clearly established, we look first to the decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeals."); *see also Wilson v. Layne*, 526 U.S. 603, 617, 119 S. Ct. 1692, 143 L.Ed.2d 818 (1999). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *al–Kidd*, 563 U.S. at 741, 131 S. Ct. 2074.

The clearly established prong will depend "substantially" on the level of generality at which the legal rule is identified. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987). Ordinarily, the right must be clearly established in a particularized sense, and not at a general or abstract sense. *Id.* at 640, 107 S. Ct. 3034. Ordinarily, "[t]his standard requires the courts to examine the asserted right at a relatively high level of specificity and on a fact-specific, case-by-case basis." *Cope v. Heltsley*, 128 F.3d 452, 458–59 (6th Cir. 1997)).

However, on the other hand, the Sixth Circuit recently affirmed that "reading the[] cases together, the Supreme Court has made clear that the sine qua non of the 'clearly established' inquiry is 'fair warning.'" *Baynes v. Cleland*, 799 F.3d 600, 612–13 (6th Cir. 2015). Thus, "[w]hile it is apparent that courts should not define clearly established law at a high level of generality, it is equally apparent that this does not mean that 'a case directly on point' is required"; the question is, again, whether "precedent [has] placed the statutory or constitutional question beyond debate." *Id.* (citing *al–Kidd*, 563 U.S. at 741, 131 S. Ct. 2074).

In short, the question is whether plaintiff had a clearly established right to intervention by officers to prevent his unlawful arrest. Clearly, § 1983 protects individuals against unlawful arrest and detention. And every circuit has recognized officers' duty to intervene at least in excessive force cases. *See Abrahante v. Johnson*, No. CIV. 07-5701JBS/KMW, 2009 WL 2152249 at *12 (D.N.J. July 14, 2009) (collecting cases from eleven circuits). Thus, the Court

13

must determine whether those protections overlap—i.e., whether there is a clearly established right to intervention in cases of unlawful arrest.

Unequivocally, yes. When officers make an arresting decision as a unit and with the permission of their supervising sergeant, applicable case law puts them on notice that their respective failures to intervene to stop an unlawful arrest—i.e., one lacking probable cause—is a constitutional violation. In determining whether a constitutional right is clearly established, the Court need not cite a perfectly apposite case; it need only answer the broader question—whether existing case law puts the constitutional question at issue beyond debate and, therefore, the officers on notice.

*Supreme Court precedent.* Neither the Court nor the parties are aware of Supreme Court cases discussing the failure to intervene in unlawful arrests. *See Holloran*, 92 F. Supp. 3d at 795. But in *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), the Supreme Court held that § 1983 protects "constitutional rights." Critically, the Supreme Court did not modify or qualify the phrase, "constitutional rights." Consequently, in the Court's view, according to *Harlow*'s clear, unambiguous language, § 1983 protects against failures to intervene in all deprivations of constitutional rights, including the right to be from unlawful arrest and detention.

*Sixth Circuit precedent.* Like *Harlow*, *Jacobs* announced an unqualified duty of officers to "affirmatively intervene to prevent other officers from violating an individual's *constitutional rights*." *Jacobs*, 5 F. App'x at 395 (emphasis added). The Sixth Circuit has also implicitly found that officers may be liable under § 1983 specifically for the failure to intervene in unlawful arrests. *See*, *e.g.*, *Simmons v. Napier*, 626 F. App'x 129, 139 (6th Cir. 2015) (discussing jury instructions for a failure to intervene in a false arrest); *Turner v. City of Taylor*, 412 F.3d 629, 652 (6th Cir. 2005) ("[D]uring Plaintiff's four day incarceration, all three Defendants were directly

14

responsible for ensuring that inmates were expeditiously presented to a magistrate for arraignment, and there is a genuine issue of material fact as to whether these Defendants knew that Plaintiff was being unlawfully detained, but failed to act."). In such cases, the Sixth Circuit assumes, even as far back as 2005, that officers may be liable for failure to intervene to prevent false arrests.

*Other Sixth Circuit district courts*. As quoted above, in *Holloran*, the court detailed for several paragraphs the evolution of the right at issue. It concluded: "As for whether the right to intervention by officers to prevent unlawful arrest was clearly established in 2012, the Court finds in the affirmative." *Holloran*, 92 F. Supp. 3d at 794. The court also noted that other district courts within the Sixth Circuit have adopted this theory of liability. *Id.* at 795. *Holloran*'s analysis on this issue is thorough, and the Court fully agrees with it.

Contrarily, at least one other district court has held that a failure to intervene in an unlawful arrest is not a clearly established constitutional violation. *Williams v. Crosby*, 43 F. Supp. 3d 794, 802 (N.D. Ohio 2014). But the Court disagrees. *Williams* did not include reasoning to support its holding, and the Court is persuaded by the case law pointing the other way.

*Other circuits.* Like *Harlow* and *Jacobs*, other circuits have stated unqualifiedly an officer's duty to intervene to prevent violations of constitutional rights. *See, e.g.*, *U.S. v. Koon*, 34 F.3d 1416, 1446–47 n.25 (9th Cir. 1994, (*rev'd on other grounds*) (stating that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen"). More specifically, other circuits agree that officers may be held liable for failure to intervene to prevent an unlawful arrest. *See*, *e.g.*, *Wilkerson v. Seymour*, 736 F.3d 974, 979 (11th Cir. 2013) (holding "that where an officer was present during an arrest and knew that the arresting officer had no reasonable basis for arguable probable cause, the non-arresting officer could be liable under § 1983 if he was sufficiently involved in the arrest"); *Yang v. Hardin*,

37 F.3d 282, 285 (7th Cir. 1994) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (same)[9]; *Jennings v. Davis*, 476 F.2d 1271, 1275 n.3 (8th Cir. 1973) (same).

Finally, defendants argue that because the vast majority of failure-to-intervene claims are made in the context of excessive force violations, the right to intervention in the context of unlawful arrests and detentions cannot be clearly established. This argument is fatally flawed. Perhaps plaintiff's claims are asserted infrequently, but that does not per se make the rights at issue less clearly established. The officers here were on notice that they had a duty to intervene to prevent violations of plaintiff's constitutional rights, and the case law shows that this duty clearly extends to unlawful arrests and detentions. For these reasons, defendants are not entitled to qualified immunity.

**IV.     State Law Claims**

   A. False Arrest

Under Michigan law, a "false arrest is an illegal or unjustified arrest." *Lewis v. Farmer Jack Div., Inc.*, 327 N.W.2d 893, 894 (Mich. 1982). An arrest without probable cause is illegal and unjustified. As explained above, there is a genuine issue of material facts as to whether the arresting officers had probable cause. Therefore, this question must go to a jury.

   B. Malicious Prosecution

Under Michigan law, to successfully assert a malicious prosecution claim, a plaintiff must prove

> (1) that the defendant has initiated a criminal prosecution against him, (2) that the criminal proceedings terminated in his favor, (3) that the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.

---

[9] The Court notes that the Sixth Circuit approvingly cited *Anderson*'s statement of the law, which held, like *Harlow* and *Jacobs*, that officers have a duty to intervene to prevent deprivations of any constitutional violation.

16

*Matthews v. Blue Cross & Blue Shield of Mich.*, 572 N.W.2d 603, 609–10 (Mich. 1998). The only difference between these elements and the elements of a malicious prosecution claim under § 1983 is element (4), malice or some other purpose.

Given our malicious-prosecution-claim analysis above, the only remaining question is whether Moses acted with malice or for a purpose besides justice. Sergeant Ball testified: "We have a competition, see who can close the most cases." Pl.'s Br. Ex. 16 p. 19.[10] Moses failed to include the exculpatory Facebook evidence and negative Knox identification in her warrant packet. Plaintiff has also shown that several of the statements in Moses's warrant request were not accurate. Perhaps these omissions and misstatements were innocent. But a reasonable jury viewing them in the light most favorable to plaintiff could find that Moses was not motivated by the desire to do justice, but to close more cases—i.e., win Sergeant Ball's competition.

C. <u>Intentional Torts Claims Against Individual Officers, Qualified Immunity</u>

Plaintiff asserts intentional tort claims against Sergeant Lucas, the arresting officers, and Moses. Defendants argue that they are qualifiedly immune from intentional tort claims.

The Michigan Supreme Court articulated qualified immunity for governmental employees against state law intentional tort claims:

> [G]overnmental employees enjoy qualified immunity for intentional torts. A governmental employee must raise governmental immunity as an affirmative defense and establish that (1) the employee's challenged acts were undertaken during the course of employment and that the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature. . . .

---

[10] Sergeant Ball clarified that this was to reward good officers for good work. *Id.*

*Odom v. Wayne County*, 760 N.W.2d 217, 218 (Mich. 2008). Regarding element (1), the Michigan Supreme Court explained that "governmental employee[s] will not be afforded immunity when committing ultra vires acts, as these are outside the scope of the employee's authority." *Id.* at 224. And regarding element (2), good faith, "there is no immunity where the inferior officer [acts] for an improper purpose." *Id.*

The individual defendants are not entitled to qualified immunity. Arresting people without probable cause is outside the scope of officers' authority. Therefore, viewing the facts in the light most favorable to plaintiff, because a jury will decide both whether there was probable cause and whether defendants acted reasonably, the Court cannot at this stage find that Sergeant Lucas and the arresting officers are qualifiedly immune. As for Moses, the question of whether she acted with an improper purpose is already going to a jury. Consequently, viewing the facts in the light most favorable to plaintiff, the Court cannot find her qualifiedly immune either.

   a. <u>All State Law Claims Against the City of Detroit</u>

Defendants argue that under *Ross v Consumers Power Co.*, 362 N.W.2d 641 (Mich. 1984), the City of Detroit is absolutely immune from intentional tort claims. Because plaintiff's response does not address this issue, he concedes it, and summary judgment is granted as to all claims against the City of Detroit.

**CONCLUSION**

Accordingly,

IT IS ORDERED that defendants' motion for summary judgment is denied in part and granted in part as set forth above; all claims against the City of Detroit and Officers Fisher, Wesley, and Moreau are dismissed. The only remaining claims are: a federal failure to intervene

and federal and state false arrest claims against Officers Washington, Tanguay, and Dennis and Sergeant Lucas; and federal and state malicious prosecution claims against Investigator Moses.

                                                s/Bernard A. Friedman
                                                BERNARD A. FRIEDMAN
                                                SENIOR UNITED STATES DISTRICT JUDGE

Dated: September 12, 2017
       Detroit, Michigan

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S Mail addresses disclosed on the Notice of Electronic filing on September 12, 2017.

                                                s/Teresa McGovern
                                                Case Manager Generalist